UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────x

TERRELL THOMAS,

               Plaintiff,

      -v-                                  No. 14 CV 4459-LTS

ARIEL WEST, HUDSON ISLAND, LLC, and
URBAN OUTFITTERS, INC.,

               Defendants.
───────────────────────────────────────────x

### MEMORANDUM OPINION AND ORDER

Plaintiff Terrell Thomas ("Plaintiff") brought this case against defendants Ariel West, Hudson Island, LLC ("Hudson Island"), and Urban Outfitters, Inc. ("Urban," collectively, "Defendants"), alleging claims of disability discrimination under Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12181 et seq., the New York State Executive Law § 296, the New York State Civil Rights Law § 40, and the Administrative Code of the City of New York § 8-107, as well as a claim of common-law negligence. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction of Thomas's related state- and city-law claims pursuant to 28 U.S.C. § 1367(a).

Plaintiff seeks an injunction requiring the removal of alleged architectural barriers at a retail clothing store operated by Urban. After this suit was brought, Urban made voluntary alterations to the store that eliminated most of the architectural barriers that Plaintiff had alleged violated the ADA. Defendants assert that the remaining alleged barriers of which Plaintiff complains do not, in fact, constitute ADA violations.

Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss Plaintiff's amended complaint as moot, or, in the alternative, for summary judgment pursuant to Rule 56 dismissing the amended complaint.

The Court has reviewed thoroughly all of the parties' submissions and, for the reasons stated below, Defendants' motion is denied insofar as it is brought pursuant to Rule 12(b)(1) and is granted in part and denied in part insofar as it seeks summary judgment.

BACKGROUND

The following facts are drawn from the parties' S.D.N.Y. Local Civil Rule 56.1 Statements of Undisputed Facts and are, unless otherwise noted, not in dispute.[1]

Urban operates a retail clothing store ("Store #143"), located at 2633 Broadway, New York, NY. (Defs.' 56.1 ¶ 1, docket entry no. 111.) Store #143 is located within a thirty-story luxury condominium building with the address of 245 West 99th Street, New York, NY (the "Building"). (Pl.'s 56.1 ¶ 1, docket entry no. 119.) Ariel West is an unincorporated association of residential condominium unit owners in the Building. (Id. ¶ 2.) Hudson Island is the owner of the commercial retail unit in the Building, which Urban currently leases for purposes of operating Store #143. (Id. ¶¶ 6-7, 9, 10.)

The Building was designed and constructed after January 26, 1993, but before March 15, 2012. (Id. ¶ 3.) The commercial unit housing Store #143 has two floors: "Story 1" (also referred to as the "Cellar Floor"), and "Story 2" (also referred to as the "Street Floor"). (Defs.' 56.1 ¶ 4.) Story 2 is about 6,095 square feet in size and contains the general public

---

[1] Because Defendants moved to dismiss the amended complaint under Rule 12(b)(1), for lack of subject-matter jurisdiction on the grounds of mootness, the Court may rely on evidentiary matter presented outside of the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

entrance to Store #143, a check-out counter, retail space, and two fitting rooms that meet ADA accessibility standards. (Id. ¶¶ 9-10.) Story 1 is about 8,708 square feet in size and contains a check-out counter, retail space, and restrooms for staff (Store #143 does not provide public restrooms). (Id. ¶¶ 5-7.) A passenger elevator permits customers to travel between Story 1 and Story 2. (Pl.'s 56.1 ¶ 13.)

        In or around 2010, after Urban entered into a lease with Hudson Island to rent the retail space for Store #143, it retained the firm David A. Levy & Associates to perform architectural services for the design and construction of the store. (Id. ¶¶ 10, 16.) As part of that construction, Urban created a new staircase connecting Story 1 and Story 2 within Store #143. (Id. ¶ 26.) Urban created and installed a 500-square feet landing level on that new staircase (the "Landing"). (Id. ¶ 27; Defs.' 56.1 ¶ 8.) At all times since Store #143 has been open for business, the Landing has contained merchandise for sale to Urban's customers. (Pl.'s 56.1 ¶¶ 28-29.) No elevator or lift connects the Landing to either Story 1 or Story 2, and Urban admits that the Landing is therefore not accessible to a wheelchair user. (Id. ¶¶ 32-33.)

        In addition to creating the new staircase and the Landing, Urban created and installed a "Mezzanine" level above Story 2, which is connected to Story 2 by another staircase. (Id. ¶¶ 19-20.) The Mezzanine is approximately 1,000 square feet in size. (Defs.' 56.1 ¶ 12.) The Mezzanine contains fifteen fitting rooms and is staffed by an Urban employee to assist customers with using the fitting rooms. (Pl.'s 56.1 ¶ 24.) No elevator or lift connects the Mezzanine to either Story 1 or Story 2; Urban admits that a wheelchair user cannot independently access the Mezzanine level. (Id. ¶¶ 22-23.)

        Plaintiff is a wheelchair user who, according to the amended complaint, attempted to access Store #143. (Am. Compl. ¶¶ 39, 46, docket entry no. 15.) On June 20, 2014, Plaintiff

filed the instant lawsuit, alleging that he had experienced various barriers to access at Store #143. He filed an amended complaint on September 11, 2014.

On March 12, 2015, Plaintiff's expert inspected Store #143 and prepared a report listing thirteen areas of alleged ADA noncompliance. (Defs.' 56.1 ¶¶ 24-25.) It is undisputed that all but three of these alleged ADA violations have been cured. (Id. ¶¶ 27-28.) The three remaining alleged violations are: (1) that there is no accessible route to the Mezzanine level; (2) that there is no accessible route to the Landing level; and (3) that throughout Store #143, some merchandise display racks project horizontally into the circulation path (as to this third issue, it appears to be undisputed that Urban has taken steps to ensure that all display structures leave clear at least the 36 inches of space required for wheelchair travel). (Id. ¶ 28.) Defendants assert that they have not cured the first two alleged violations because the conditions do not, as a matter of law, violate the ADA or other law.

DISCUSSION

Mootness

Defendants argue that they have voluntarily modified Store #143 so as to remove all of the alleged barriers to access of which Plaintiff makes valid complaints, making this case moot. Therefore, Defendants conclude, this Court lacks subject-matter jurisdiction of Plaintiff's lawsuit.

The mootness doctrine is derived from Article III of the Constitution, which gives the federal judiciary authority to adjudicate "Cases" and "Controversies." U.S. CONST. art. III, § 2. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable

interest in the outcome." <u>Already, LLC v. Nike, Inc.</u>, 133 S. Ct. 721, 726 (2013) (internal

quotation marks omitted) (quoting <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982) (per curiam)).

 However, "[a] case becomes moot only when it is impossible for a court to grant

<u>any</u> effectual relief whatever to the prevailing party." <u>Knox v. Serv. Employees Int'l Union,</u>

<u>Local 1000</u>, 132 S. Ct. 2277, 2287 (2012) (emphasis added) (internal quotation marks omitted)

(quoting <u>Erie v. Pap's A.M.</u>, 529 U.S. 277, 287 (2000)). "[A]s long as the parties have a concrete

interest, however small, in the outcome of the litigation, the case is not moot." <u>Ellis v. Bhd. of</u>

<u>Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.</u>, 466 U.S. 435, 442 (1984)

(citing <u>Powell v. McCormack</u>, 395 U.S. 486, 496-98 (1969)).

 Here, there is no question that at least some portions of Plaintiff's claims are not

moot. The parties vigorously dispute whether the failure to provide an accessible route to either

the Landing or the Mezzanine constitutes an ongoing violation of the ADA or other laws.

Defendants have not voluntarily corrected this lack of access because they assert that they are not

legally obligated to do so. Resolution of this question requires a determination on the merits—

the application of the law to this case's specific facts—which necessarily constitutes a "live"

issue. Given that at least some of Plaintiff's claims are not moot, the Court retains subject-matter

jurisdiction of this case. <u>Gropper v. Fine Arts Hous., Inc.</u>, 12 F. Supp. 3d 664, 670 (S.D.N.Y.

2014).[2]

---

[2] Although the entire case is not moot and the Court has subject matter jurisdiction,
Plaintiff's federal claims related to the conditions that Urban has voluntarily remedied are
moot in the sense that the Court is unable to grant Plaintiff any form of relief (as Title
III's only remedy is prospective injunctive relief). Therefore, as discussed below, the
Court grants summary judgment dismissing Plaintiff's federal claims related to those
remediated conditions, and declines to exercise supplemental jurisdiction of the state and
local claims concerning those same conditions.

Therefore, the Court denies Defendants' motion insofar as it is brought pursuant to Federal Rule of Civil Procedure 12(b)(1) and addresses the motion as one for summary judgment pursuant to Federal Rule of Civil Procedure 56, which Defendants have invoked as an alternative basis for relief.

Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute concerning material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. See Anderson, 477 U.S. at 248. In making its determination, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. See id. at 255.

Plaintiff's ADA Claims Relating to the Mezzanine and the Landing[3]

The ADA's Statutory Framework

The ADA was enacted "to remedy widespread discrimination against disabled individuals." PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001). The law is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2015). It has been described as "a milestone on the path to a more decent, tolerant, progressive society." Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring).

As a remedial statute, the ADA must be broadly construed to effect its purpose. Noel v. N.Y. City Taxi & Limousine Comm'n, 687 F.3d 63, 68 (2d Cir. 2012). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." Martin, 532 U.S. at 675 (footnotes omitted).

Title III of the ADA addresses discrimination in places of public accommodation. Its general prohibition on such discrimination provides:

> No individual shall be discriminated against on the basis of disability in the full
> and equal enjoyment of the goods, services, facilities, privileges, advantages, or

_____

[3] As the parties do not argue that Plaintiff's related state- and city-law claims should be analyzed under standards that are different from the ADA, the Court focuses its analysis on the viability of Plaintiff's claims under Title III of the ADA. See Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006) ("A claim of disability discrimination under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims." (internal citation omitted)); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) ("Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights [L]aw cannot fall." (quoting The Local Civil Rights Restoration Act of 2005 § 1, N.Y.C. Local Law No. 85 (2005))).

accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (2015). "A Title III claim therefore requires that a plaintiff establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." Roberts v. Royal Atl. Corp., 542 F.3d 363, 368 (2d Cir. 2008).

Here, only the third element (discrimination) is in dispute. All agree that Plaintiff, as a wheelchair user, is disabled within the meaning of the law and that Store #143, a clothing store, qualifies as a "place of public accommodation." See 42 U.S.C. § 12181(7)(E) (2015) (defining "public accommodation" to include clothing stores if their operations affect commerce).

Applicable ADA Regulations

Congress empowered the Attorney General to issue regulations to enforce Title III of the ADA as applied to places of public accommodation. See 42 U.S.C. § 12186(b). On July 26, 1991, the Department of Justice ("DOJ") issued such regulations (the "DOJ Regulations"). See 28 C.F.R. part 36. The DOJ Regulations incorporate the 1991 Standards for Accessible Design (the "1991 Standards"). See 28 C.F.R. part 36 app. D. Those standards were revised in 2010 (the "2010 Standards"), but new construction and alterations begun prior to March 15, 2012, may choose to comply only with the 1991 Standards. See 28 C.F.R. § 36.406(a)(1) (providing that new construction and alterations prior to September 15, 2010 need only comply with the 1991 Standards); id. § 36.406(a)(2) (providing that new construction and alterations between September 15, 2010 and March 15, 2012 may comply with either the 1991 Standards or

the 2010 Standards). The parties agree that the Building was constructed and the alteration work on Store #143 was performed after January 26, 1993 but before March 15, 2012. (Pl.'s 56.1 ¶ 3.) Both parties' arguments are directed to the 1991 Standards. (See Defs.' Br. at 8-18, docket entry no. 110 (applying the 1991 Standards); Pl.'s Br. at 5, docket entry no. 122 (arguing that only the 1991 Standards apply).)

The 1991 Standards distinguish between "newly designed or newly constructed buildings" and "altered portions of existing buildings and facilities." See 1991 Standards § 4.1.1. The 1991 Standards impose comprehensive requirements for new construction, and specify the aspects of those requirements that apply in connection with alterations of premises. Compare id. § 4.1.1 (standards for new construction), with id. § 4.1.6 (standards for alterations). There is no dispute that the erection of the staircase between Story 1 and Story 2, including the Landing, and the installation of the Mezzanine and its staircase, constituted alterations within the meaning of the regulations. (See Defs.' Response to Pl.'s 56.1 ¶ 17; Am. Compl. ¶¶ 18, 21.)

The ADA defines "discrimination" in the context of altered facilities to include "a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12183(a)(2) (2015). Altered portions of existing facilities must comply with all of the standards for new construction, 1991 Standards § 4.1.1(1), and if the alteration "affects or could affect the usability of or access to an area containing a primary function," id. § 4.1.6(2), then the altered "element, space, or common area" must comply with any standard that would require that element, space, or common area to be on an accessible route. Id. § 4.1.6(1)(b).

Merchandise display areas and dressing and fitting rooms are primary function areas of a clothing store, and so alterations to those spaces must comply with any standard of new construction, including any requirement that those spaces must be on an accessible route. The term "primary function" means "a major activity for which the facility is intended," such as "the customer services lobby of a bank, the dining area of a cafeteria, [or] the meeting rooms in a conference center." 28 C.F.R. § 36.403(b). It is indisputable that this definition covers merchandise display areas and dressing rooms in a clothing store, and the DOJ's regulations specifically list "[r]emodeling merchandise display areas or employee work areas in a department store" as an example of an "[a]lteration[] that affect[s] the usability of or access to an area containing a primary function." 28 C.F.R. § 36.403(c)(1)(i). Because the alterations to Store #143 affected the usability of, or access to, areas containing merchandise display areas and fitting rooms, all of the 1991 Standards for new construction—Sections "4.1 through 4.35"—apply to the display and fitting room areas of the Landing and the Mezzanine, including any requirement that those spaces be on an accessible route. 1991 Standards §§ 4.1.1(1), 4.1.6(1)(b), 4.1.6(2).

Section 4.1.3 requires that "[a]t least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility." 1991 Standards § 4.1.3(1).[4] Other provisions specify that merchandise display units and fitting rooms must be on accessible routes. See id. § 4.1.3(12)(b)

---

[4] An "accessible route" is "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility. Interior accessible routes may include corridors, floors, ramps, elevators, lifts, and clear floor spaces at fixtures." 1991 Standards § 3.5. An "accessible space" is a "[s]pace that complies with these guidelines," with "space" being defined as "[a] definable area, e.g., room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby." Id.

("Shelves or display units allowing self-service by customers in mercantile occupancies shall be located on an accessible route complying with 4.3. . . ."); id. § 4.35.1 ("Dressing and fitting rooms required to be accessible by 4.1 shall comply with 4.35 and shall be on an accessible route.").

In addition, Section 4.1.6(1)(f) provides that, "[i]f an escalator or stair is planned or installed where none existed previously and major structural modifications are necessary for such installation, then a means of accessible vertical access shall be provided that complies with the applicable provisions of 4.7 [curb ramps], 4.8 [ramps], 4.10 [elevators], or 4.11 [platform lifts]." There is no dispute that the alterations which created the Landing and the Mezzanine also involved the installation of new staircases linking those spaces to Story 1 and Story 2. No previous staircase existed in this location, and there is no dispute that "major structural modifications" were necessary for the installation. Thus, Store #143 must also comply with this requirement.

The parties devote a large proportion of their argumentation to the question of whether Defendants must further alter Store #143, which has had an elevator serving Stories 1 and 2 since before the Landing and the Mezzanine were built, to provide additional elevator facilities serving the Landing and the Mezzanine. Having reviewed thoroughly the pertinent ADA statutory, regulatory, and Guidelines provisions pertaining to elevators, the Court has determined that the installation of an additional elevator in Store #143 is not specifically required, principally because Store #143 has fewer than three stories and the pre-existing elevator was not altered when the store facility was modified to include the Landing and the Mezzanine. 1991 Standards § 4.1.6(k)(i) ("These guidelines do not require the installation of an elevator in an altered facility that is less than three stories or has less than 3,000 square feet per

story."). However, although Defendants need not install a new elevator in Store #143,

Defendants are not relieved of the overarching obligation to ensure that primary function areas of

Store #143 (such as merchandise display and fitting room areas) are on accessible routes.

In sum, the 1991 Standards require that a form of accessible vertical access for the

disabled be provided to the Landing and Mezzanine levels because (1) the display and fitting

room areas of the Landing and the Mezzanine must be on an accessible route and (2) Urban's

alterations included the installation of a new staircase to these two new levels. The 1991

Standards thus afford Defendants the choice of providing accessible vertical access to the

Landing and the Mezzanine through the installation of ADA-compliant curb ramps, ramps,

elevators, or platform lifts, see 1991 Standards § 4.1.6(1)(f), so long as those areas are used for a

"primary function," like displaying merchandise or for fitting or dressing rooms.


The Equivalent Facilitation Rule

Defendants argue that, even if they are required to provide a form of accessible

vertical access to the Landing and Mezzanine levels, they have satisfied that requirement by

providing "substantially equivalent access" to both spaces. Section 2.2 of the 1991 Standards

(hereinafter, the "Equivalent Facilitation Rule") provides: "Departures from particular technical

and scoping requirements of this guideline by the use of other designs and technologies are

permitted where the alternative designs and technologies used will provide substantially

equivalent or greater access to and usability of the facility." 1991 Standards § 2.2 (emphasis

added). Defendants argue that they have satisfied the requirements of the Equivalent Facilitation

Rule by (1) ensuring that all merchandise displayed on the Landing level is duplicated in other

accessible areas of the store, and (2) providing two ADA-compliant dressing rooms on Story 2,

in addition to the dressing rooms located on the Mezzanine level.

No court within the Second Circuit has analyzed the Equivalent Facilitation Rule in depth, but three decisions from the other circuits provide instructive analyses. In <u>Kohler v. Flava Enterprises, Inc.</u>, 779 F.3d 1016, 1019 (9th Cir. 2015), the Ninth Circuit applied the Equivalent Facilitation Rule to permit a dressing-room bench to be longer than the required 48 inches after concluding that it provided "substantially equivalent" access to wheelchair users because "a person 'using a wheelchair' [was] able 'to make a parallel transfer onto the bench,'" which was the key purpose of the 48-inch requirement. <u>Id.</u> (quoting 2010 Standards § 4.35.4). That case did not involve segregated services or the provision of services in a different manner for the disabled; the decision simply confirmed that a larger bench than the standard one specified in the Standards, which allowed the same freedom of movement within the area subject to the accessibility requirement, was compliant under the Equivalent Facilitation Rule.

<u>Antoninetti v. Chipotle Mexican Grill, Inc.</u>, 643 F.3d 1165, 1174 (9th Cir. 2010), on the other hand, involved a restaurant facility in which wheelchair users were unable to order their food and observe food preparation in the same manner as non-disabled patrons. The Ninth Circuit, applying the Equivalent Facilitation Rule, concluded that the restaurant's policy of "showing [disabled wheelchair users] samples of the individual foods in serving spoons, held in tongs or in plastic cups, or assembling the food at the 'transaction station' or at a table in the seating area" did not provide "substantially equivalent or greater access to and usability of the facility" and thus violated the ADA's accessibility mandate. <u>Id.</u> The policy, the court concluded, did not provide wheelchair users with the same "experience" of personally participating "in the selection and preparation of the food" that was characteristic of the restaurant and was provided to other customers, but instead offered only a non-compliant "substitute" experience that did not remedy the ADA violation arising from a wall between customers and servers that prevented

patrons in wheelchairs from seeing the available food, selecting it from the counter, and watching its preparation from the customer side of the counter. Id. at 1174-75. The decision teaches persuasively that places of public accommodation cannot invoke the Equivalent Facilitation Rule to validate policies that provide only separate, "substitute" experiences for disabled customers rather than the equal access that the ADA requires.

Nor does the Equivalent Facilitation Rule render Urban's policy of "duplicating" the displays on the Landing in other, accessible, parts of Store #143 sufficient to comply with the ADA's requirement that the Landing, which is a primary store function area, be accessible. Like the restaurant's alterative display and food preparation policy in Antoninetti, it offers disabled customers only a "substitute" form of access to the merchandise displayed on the Landing and thus is not substantially equivalent to an accessible route to the Landing. As the Third Circuit explained in Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront, 193 F.3d 730, 739 (3d Cir. 1999), public accommodations cannot avoid the requirement of providing equal access by confining disabled customers to a particular part of their facility, even where that part is arguably more comfortable and provides extra space. In Caruso, the issue was whether a music and entertainment facility's provision of additional wheelchair-accessible seats in an interior pavilion was "substantially equivalent" to making an outdoor lawn area wheelchair-accessible. The Third Circuit concluded that the Equivalent Facilitation Provision does not allow denial of access, but instead only allows technical deviations from the ADA Standards where such deviations will provide "equivalent or greater access to or usability of the facility." Id. at 739. The Rule thus could not be used to "excuse . . . failure to provide any wheelchair access" to the outdoor portion of the facility." Id.

Similarly, Defendants here cannot avoid their obligation to provide equal access to all merchandise display areas, including the display area on the Landing, by simply displaying the same merchandise in another accessible area of the store, or by having an employee bring merchandise from the Landing to a wheelchair user who is unable to get to the Landing. These substitutes do not provide any access at all, much less equivalent or greater access, to the Landing, which is required to be accessible, and clearly deprive disabled patrons of the opportunity to shop on the newly-constructed Landing in the same fashion as customers who are not disabled. Furthermore, Defendants' approach is contrary to Title III's overarching purpose of providing maximum integration of disabled persons in places of public accommodation. "Separate, special, or different programs that are designed to provide a benefit to persons with disabilities cannot be used to restrict the participation of persons with disabilities in general, integrated activities." Id. (quoting 28 C.F.R. part 36 app. B, at 622).

Defendants' appeal to the Equivalent Facilitation Rule to justify as compliant their provision of two accessible fitting rooms for the disabled in lieu of access to the large set of fitting rooms on the new Mezzanine is likewise unavailing. However convenient the two separate rooms may be, they do not permit mobility-impaired patrons to participate with non-disabled fellow patrons in the general, integrated activities of trying on new clothing and observing one another in the fitting room setting. Moreover, the inaccessible Mezzanine fitting-room arrangement violates a specific provision of the 1991 Standards, which provide that, "where dressing and fitting rooms are provided for use by the general public, patients, customers, or employees, 5 percent, but never less than one, of dressing rooms for each type of use in each cluster of dressing rooms shall be accessible and shall comply with 4.35." 1991 Standards § 4.1.3(21) (emphasis added). The 1991 Standards further require that "[d]ressing and fitting

rooms required to be accessible by 4.1 shall comply with 4.35 and <u>shall be on an accessible route</u>." 1991 Standards § 4.31.1 (emphasis added).

Thus, Store #143 must have a certain number of accessible dressing rooms in each "cluster" of dressing rooms provided,[5] and those dressing rooms must be on an accessible route. The accessible fitting rooms on Story 2 of Store #143, which are distant from those on the Mezzanine, constitute a separate "cluster" from the Mezzanine fitting room area. Urban chose to create fifteen new dressing rooms on the Mezzanine; at least one of those dressing rooms must be accessible <u>and</u> on an accessible route. Providing a separate ADA-accessible area for disabled patrons does nothing to provide access to the Mezzanine and thus fails to qualify as compliant under the Equivalent Facilitation Rule.

Here, Urban chose to undertake alterations to Store #143 that created new spaces that cannot be accessed by disabled customers like Plaintiff. Defendants have not provided accessible routes to those spaces, and their alternative measure do not provide "substantially equivalent access." Defendants thus have not demonstrated that they are entitled to judgment as a matter of law on the portion of Plaintiff's ADA claim relating to access to the Mezzanine and Landing. Indeed, it appears likely that Plaintiff is entitled to judgment in his favor. Therefore, the Court will issue a separate order directing Defendants to show cause as to why the Court should

---

[5] Although the 1991 Standards do not define "cluster," the DOJ provided this guidance on the term when it later issued the 2010 Standards: "A 'cluster' is a group of rooms proximate to one another. Generally, rooms in a cluster are within sight of, or adjacent to, one another." Advisory 222.1 to the 2010 Standards. Reliance on this definition is not necessary, however, as the plain meaning of the word "cluster" implies close physical proximity. E.g., THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 352 (4th ed. 2000) ("A group of the same or similar elements gathered or occurring closely together; a bunch . . . ."); 3 THE OXFORD ENGLISH DICTIONARY 374 (2d ed. 1989) ("A collection of things of the same kind, as fruits or flowers, growing closely together; a bunch . . . .").

not (1) grant summary judgment in Plaintiff's favor on this portion of his ADA claim (as well as the related state- and city-law claims) and (2) enjoin them from utilizing the Landing and Mezzanine levels for primary store functions such as merchandise display and fitting areas unless and until those levels are brought into compliance with the applicable ADA Standards. If summary judgment is granted, only Plaintiff's damages claims under the State and City Human Rights Laws for these conditions will remain for trial since, as explained below, Defendant is entitled to summary judgment on the remaining ADA claim, which relates to the circulation path in Store #143.

Plaintiff's ADA Claim Relating to the Circulation Path

The other remaining alleged ADA violation is that, throughout Store #143, some merchandise display racks project horizontally into the circulation path. This appears to be an allegation of a violation of 1991 Standards § 4.4, "Protruding Objects," or § 4.2, "Space Allowance and Reach Ranges." Urban asserts that Plaintiff lacks standing to assert these allegations, as Section 4.4 is designed for the visually impaired, and that Urban's inspection of Store #143 did not reveal any objects protruding into the circulation path.

Regardless of whether a plaintiff must be visually impaired to assert a violation of Section 4.4, Plaintiff's allegation could just as easily be read as an allegation that Urban was in violation of Section 4.2, which mandates a 36-inch wide path in order for a wheelchair to maneuver through the store. 1991 Standards § 4.2.1. As a wheelchair user, Plaintiff clearly has standing to allege a violation of this requirement.

Defendants have established that there is no genuine issue of material fact regarding this alleged violation. They have tendered evidence that, on May 20, 2015, Dan Busch, Urban's Executive Director of Development, inspected Store #143 and found no display racks

obstructing the circulation path. (Defs.' 56.1 ¶ 31.) He has issued a memorandum to all of the store's employees directing that a 36-inch-wide path between all display racks be maintained at all times. (Id.) A copy of that memorandum, which includes a diagram showing the required width of a wheelchair-accessible route, is in the record. (See Busch Decl. Ex. E, docket entry no. 113-6.) In addition, the Visual Training and Merchandising Guide provided to Store #143's managers, states that "All fixtures should be at least three feet apart for easy customer access and traffic pathways." (Busch Decl. Ex. F at 26, docket entry no. 113-9.) Plaintiff has proffered no specific evidence of the location or effects of the allegedly protruding racks that were mentioned in one sentence of his expert's report, and has not controverted Defendants' evidence concerning the later inspection and implementation of policies designed to maintain compliant pathways.

It is also notable that courts have expressed reluctance to mandate the removal of movable objects. E.g., Eiden v. Home Depot USA, Inc., No. CIVS04-977, 2006 WL 1490418, at *12 (E.D. Cal. May 26, 2006) ("Plaintiff fails to cite any authority for the proposition that movable objects, such as shopping carts or merchandise in the aisles, falls within the ambit of the [1991 Standards]."). Plaintiff has tendered no evidence suggesting that Urban engages in a regular practice of placing movable display stands in the path of circulation in violation of its own written policies.

Defendants have thus demonstrated that they are entitled as a matter of law to summary judgment dismissing Plaintiff's ADA claims insofar as they relate to allegedly protruding display racks. The Court declines to exercise supplemental jurisdiction of Plaintiff's state- and city-law claims to the extent they relate to the same movable display rack issue.

<u>Plaintiff's Other ADA Claims and Related State- and City-Law Claims</u>

Plaintiff does not contest that, other than the three barriers just discussed (vertical access to the Mezzanine, vertical access to the Landing, and the movable rack issue), Defendants have voluntarily remedied all of the other architectural barriers to access identified in the Amended Complaint and in Plaintiff's expert report as violative of Title III of the ADA.

"A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages." <u>Powell v. Nat'l Bd. of Med. Examiners</u>, 364 F.3d 79, 86 (2d Cir.) (citing <u>Newman v. Piggie Park Enterprises, Inc.</u>, 390 U.S. 400, 402 (1968)), <u>opinion corrected</u>, 511 F.3d 238 (2d Cir. 2004). Therefore, "under certain circumstances, a claim under the ADA can become moot if a defendant remedies the access barrier during the pendency of the litigation." <u>Bacon v. Walgreen Co.</u>, 91 F. Supp. 3d 446, 451 (E.D.N.Y. 2015) (citing <u>Oliver v. Ralphs Grocery Co.</u>, 654 F.3d 903, 905 (9th Cir. 2011)). The voluntary removal of an alleged barrier to access may render a Title III claim moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." <u>Clear Channel Outdoor, Inc. v. City of N.Y.</u>, 594 F.3d 94, 110 (2d Cir. 2010) (quoting <u>Campbell v. Greisberger</u>, 80 F.3d 703, 706 (2d Cir. 1996)).

Here, Defendants have made permanent structural alterations to Store #143, making recurrence of the alleged violations highly unlikely. Defendants are therefore entitled to judgment as a matter of law dismissing these claims regarding already-remediated conditions as moot.

The Court declines to exercise supplemental jurisdiction of Plaintiff's related state- and city-law claims arising from those same remediated conditions.

<u>Plaintiff's Negligence Claim</u>

Defendants seek dismissal of Plaintiff's common-law negligence claim on the ground that the claim, which alleges that Defendants acted negligently solely based on their alleged violations of the ADA and other statutes, is not cognizable. Plaintiff has alleged no injury beyond his inability to fully access Store #143. Although the ADA does not preempt state common-law causes of action, a plaintiff may not establish a common-law negligence claim based purely on a failure to design a place of public accommodation in accordance with federal or state statutes, absent further injury. <u>Francis v. Lo-Do Corp.</u>, No. 14-CV-5422, 2014 WL 7180091, at *2 (S.D.N.Y. Dec. 5, 2014). Plaintiff's negligence claim (Count 5) is, therefore, dismissed in its entirety.

CONCLUSION

For the reasons stated above, Defendants' motion is denied insofar as it seeks dismissal of the case as moot, and is granted in part and denied in part insofar as it seeks summary judgment. Summary judgment dismissing Plaintiff's ADA claims relating to alleged violations other than access to the Landing and the Mezzanine is granted, and the Court declines to exercise supplemental jurisdiction of Plaintiff's state- and city-law claims relating to those alleged violations. Plaintiff's negligence claim is dismissed in its entirety. Defendants' motion is denied in all other respects. The parties are directed to meet promptly with the Magistrate Judge for settlement purposes.

The Court will issue a separate order directing Defendants to show cause as to why summary judgment and injunctive relief should not be granted in Plaintiff's favor on the

ADA, state- and city-law claims relating to access to the Landing and the Mezzanine levels of

Store #143.

This Memorandum Opinion and Order resolves docket entry nos. 109 and 114.

SO ORDERED.


Dated: New York, New York
       March 15, 2017

                                              /s/ Laura Taylor Swain
                                             LAURA TAYLOR SWAIN
                                             United States District Judge